T.C. Memo. 2007-283

UNITED STATES TAX COURT

RICHARD S. COTLER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11565-05L.          Filed September 19, 2007.

<u>Charles L. Ruffner</u>, for petitioner.

<u>Derek P. Richman</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Pursuant to section 6330(d),[1] petitioner,
Richard S. Cotler (Mr. Cotler), seeks review of respondent's
determination to proceed with collection of his 1997 and 1998 tax
liabilities.  The issue for decision is whether the disability

_____

[1] Unless otherwise indicated, all section references are to
the Internal Revenue Code, as amended, and all Rule references
are to the Tax Court Rules of Practice and Procedure.

benefits Mr. Cotler received in 1997 and 1998 are excludable from income under section 104(a)(3).

## FINDINGS OF FACT

Some facts have been stipulated and are so found.  The stipulated facts and the attached exhibits are incorporated herein by this reference.  At the time he filed the petition, Mr. Cotler resided in Hollywood, Florida.

Since 1974, Mr. Cotler was a practicing attorney in the State of Florida.  Mr. Cotler was a shareholder in Cotler & Baseman, P.A. (the firm).[2]  At all times, Mr. Cotler was either a 99-percent or a 100-percent shareholder of the firm.

Beginning on November 1, 1993, the firm held a long-term group disability insurance policy with Standard Insurance Company (Standard).  The firm wrote the checks to pay the premiums on the Standard policy.  The portion of the Standard disability monthly premium attributable to Mr. Cotler was $81 per month.

In 1996, Mr. Cotler began experiencing constant and severe headaches, which were diagnosed as chronic intractable headaches. The headaches left Mr. Cotler unable to focus for long periods, unable to work, and caused the firm to struggle.  After traditional medicine did not alleviate his pain, Mr. Cotler traveled to Chicago and Italy to receive alternative medical

---

[2] At some point, the firm was known as Richard S. Cotler, P.A.

treatments.  Mr. Cotler worked hard to achieve success and hoped to find a cure that would allow him to continue his business.

In order to keep the firm operational, Mr. Cotler began lending the firm money in 1996.  At the end of 1996, the balance of Mr. Cotler's loan to the firm was $5,027.  As Mr. Cotler's health deteriorated, he was unable to work and had to lend more money to the firm.  By the end of 1997, the firm owed Mr. Cotler $74,934.  By the end of 1998, the firm owed Mr. Cotler $177,770.  As of the date of trial, Mr. Cotler's condition had not improved.  Mr. Cotler closed the firm in 2000 and subsequently filed for bankruptcy.  Mr. Cotler expects never to work in his profession again.

Mr. Cotler filed a long-term disability claim with Standard on April 8, 1997.  On the disability claim application, Mr. Cotler stated that he paid 100 percent of the premiums.  Standard declared Mr. Cotler disabled and waived premiums on the policy, in August 1997.  The total amount of Standard premiums attributable to Mr. Cotler in 1997 was $567.

From approximately 1994 until 2000, Mr. Cotler employed Arline Marlane as an outside bookkeeper for the firm.  Ms. Marlane wrote all the checks for the firm, completed the payroll tax returns, and reconciled bank statements.  After each check was written, the amount of the check would then be entered into a specific column, representing a particular expense category.  The

cash disbursements journal included a specific column for insurance expenses.  The checks made out to Standard for the disability insurance were initially entered into the insurance expense column.

In either January or February, after the close of the year, Mr. Cotler, in consultation with Bruce Gladstone (Mr. Gladstone), a certified public accountant employed by the firm, would make adjusting entries to the cash disbursements journal.  Mr. Cotler would reduce the amount of the insurance expense column by the amount of the Standard premium that was attributable to him; i.e., $81 per month (thereby subtracting the firm's insurance expenses).  The $81 per month was concurrently subtracted from Mr. Cotler's shareholder loan account to the firm (which subtracted the amount the firm owed to Mr. Cotler) to reflect the fact that he personally paid for his disability insurance. Furthermore, at the end of the year, Mr. Cotler had a consistent practice of going through the cash disbursements journal and subtracting his personal expenses from the expense columns to ensure that they were not deducted on the firm's Form 1120, U.S. Corporation Income Tax Return.

Mr. Gladstone prepared a document entitled "Loan Receivable--Stockholder" that reflected that Mr. Cotler's personal expenses were subtracted from his loan account to the firm.  For 1997, Mr. Gladstone subtracted $567 from Mr. Cotler's

loan account to the firm for the total amount of disability premiums paid in 1997 to Standard on Mr. Cotler's behalf. These adjustments normally took place when Mr. Gladstone prepared the firm's Form 1120. For the 1997 year, the adjustments were made about the time the firm's tax return for 1997 was filed. Mr. Cotler's insurance premiums that he paid were not deducted on the firm's 1997 Form 1120.

For 1997, Standard issued Mr. Cotler a Form W-2, Wage and Tax Statement.[3] On October 19, 1998, Mr. Cotler filed his Form 1040, U.S. Individual Income Tax Return, for 1997. Mr. Cotler's 1997 tax return reported taxable income of $144,294. This included $72,445 that Mr. Cotler received from Standard as disability payments. At the time that Mr. Cotler signed and filed his 1997 tax return, he was very ill and did not review the return carefully. Mr. Cotler's wife, Judy Cotler (Mrs. Cotler), gathered the tax materials for 1997 and gave them to the return preparer.

On October 22, 1999, Mr. Cotler filed his tax return for 1998. The $72,000 received from Standard in 1998 by Mr. Cotler was reported as taxable income on his 1998 tax return. At the time that Mr. Cotler signed and filed his 1998 tax return, he still was very ill and did not review the return carefully.

---

[3] We do not understand why Standard would issue Mr. Cotler a Form W-2, but they did.

Again, Mrs. Cotler gathered the tax materials for 1998 and gave them to the return preparer.

On August 23, 2004, Rick Leone (Mr. Leone), an attorney, sent Steven Poindexter, a disability claims specialist for Standard, a letter disputing the characterization of Mr. Cotler's 1997 and 1998 disability benefits. Mr. Poindexter responded informing Mr. Leone that there was nothing Standard could do and that Mr. Cotler should take his claim up with the Internal Revenue Service (IRS).

In May 2003, after a series of storms, the climate-controlled storage facility where Mr. Cotler kept his personal records, and the firm's records, flooded. When the storage facility notified Mr. Cotler about the flooding, he and Mrs. Cotler went to the facility to attempt to salvage the water-soaked records. Because the mildew aggravated Mr. Cotler's illness, he was unable to help recover the records. As a result of the flooding, many of Mr. Cotler's records and the firm's records were destroyed.

On February 12, 2004, Mr. Cotler submitted a Form 656, Offer in Compromise (OIC), to respondent for his 1997, 1998, and 1999 tax years. The OIC was based on doubt as to liability. Respondent returned Mr. Cotler's OIC because respondent determined it to be not processable.

On August 31, 2004, respondent issued Mr. Cotler a Final Notice--Notice of Intent to Levy and Notice of Your Right to a Hearing (notice of intent to levy) regarding his outstanding 1997 and 1998 income tax liabilities.

On September 1, 2004, respondent filed a Notice of Federal Tax Lien (NFTL) for years 1997 and 1998.  On September 3, 2004, the IRS provided Mr. Cotler with a Notice of Federal Tax Lien Filing and Your Right to a Hearing Under IRC 6320 (notice of lien).  Mr. Cotler timely submitted to respondent a Form 12153, Request For Collection Due Process Hearing, contesting his underlying liability.

On May 20, 2005, respondent issued a Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330 sustaining the notice of intent to levy and the filing of the NFTL.  Mr. Cotler timely petitioned the Court.

OPINION

I.  Collection

Petitioner has neither claimed nor shown that he satisfied the requirements of section 7491(a) to shift the burden of proof to respondent with regard to any factual issue relevant to ascertaining his liability for any tax imposed under subtitle A of the Code.  Accordingly, petitioner bears the burden of proof. Rule 142(a).

Section 6320 provides that the Secretary will furnish the person described in section 6321 with written notice (i.e., the hearing notice) of the filing of a notice of lien under section 6323. Section 6320 further provides that the taxpayer may request administrative review of the matter (in the form of a hearing) within a 30-day period. The hearing generally will be conducted consistent with the procedures set forth in section 6330(c), (d), and (e). Sec. 6320(c).

Pursuant to section 6330(c)(2)(A), a taxpayer may raise at the section 6330 hearing any relevant issue with regard to the Commissioner's collection activities, including spousal defenses, challenges to the appropriateness of the Commissioner's intended collection action, and alternative means of collection. Sego v. Commissioner, 114 T.C. 604, 609 (2000); Goza v. Commissioner, 114 T.C. 176, 180 (2000). If a taxpayer received a statutory notice of deficiency for the years in issue or otherwise had the opportunity to dispute the underlying tax liability, the taxpayer is precluded from challenging the existence or amount of the underlying tax liability. Sec. 6330(c)(2)(B); Sego v. Commissioner, supra at 610-611; Goza v. Commissioner, supra at 182-183.

When the Commissioner issues a determination regarding a disputed collection action, section 6330(d) permits a taxpayer to seek judicial review in this Court. If the underlying tax

liability is properly at issue, we review that issue de novo.
Sego v. Commissioner, supra at 610; Goza v. Commissioner, supra
at 181.  If the validity of the underlying tax liability is not
at issue, we review the Commissioner's determination for abuse of
discretion.  Sego v. Commissioner, supra at 610.  Mr. Cotler did
not receive a notice of deficiency for 1997 or for 1998, he
raised his underlying liability at the section 6330 hearing, and
he is entitled to contest the underlying tax liability for 1997
and 1998.[4]  Montgomery v. Commissioner, 122 T.C. 1, 5 (2004).

## II.  Disability Benefits

Mr. Cotler argues that the disability benefits that he
received in 1997 and 1998 are excludable from gross income
pursuant to section 104(a)(3).  Respondent determined that the
amounts are not excluded from gross income.

Gross income includes income from whatever source derived.
Sec. 61(a).  Gross income, however, does not include amounts
received through accident and health insurance for personal
injuries or sickness other than amounts received by an employee,
to the extent such amounts:  (1) Are attributable to
contributions by the employer which were not includable in the
gross income of the employee, or (2) are paid by the employer.
Sec. 104(a)(3); see also Tuka v. Commissioner, 120 T.C. 1 (2003),

---

[4]  Respondent does not argue that Mr. Cotler is precluded
from challenging his underlying liability.

affd. 85 Fed. Appx. 875 (3d Cir. 2003).

Mr. Cotler argues that although the firm wrote the checks that paid for the Standard policy, he reimbursed the firm for the amount of his premiums by deducting these amounts from his shareholder loan account. In Bouquett v. Commissioner, T.C. Memo. 1994-212, a corporation paid the premiums on the taxpayer's disability policy. In Bouquett, we held that the corporation was nothing more than a conduit that paid the premiums nominally and then collected the premium payments from the employees. Mr. Cotler reimbursed the firm by subtracting the amounts of the insurance premiums from his loan to the firm. Mr. Cotler's firm was nothing more than a conduit.

Ms. Marlane and Mr. Gladstone credibly testified that Mr. Cotler had a longstanding and consistent practice of not paying personal expenses with corporate funds. From the inception of the Standard policy until premiums were waived, Mr. Cotler treated the premiums as personal items, he paid his share of the premiums during the years in issue through his loan account, and the firm never deducted them on its Forms 1120.

Respondent argues that Mr. Cotler failed to reimburse his firm for the premiums on the Standard policy. Respondent further argues that the bookkeeping entries and the shareholder loan receivable document do not demonstrate that Mr. Cotler actually paid the premiums on the Standard policy. We disagree. Since

1993, when the Standard policy began, until premiums were waived in 1997, Mr. Cotler paid the premiums on the Standard policy. Mr. Cotler, and not the firm, bore the economic burden of the disability premiums. Accordingly, we conclude that Mr. Cotler was bearing the economic burden, and therefore the disability payments Mr. Cotler received in 1997 and 1998 are excludable from income under section 104(a)(3).

In reaching all of our holdings herein, we have considered all arguments made by the parties, and, to the extent not mentioned above, we find them to be irrelevant or without merit.

It is unclear from the record, however, whether after application of our holding that Mr. Cotler did not have to report the disability payments from Standard in 1997 and 1998, if his tax liabilities for 1997 and 1998 remain unpaid. Accordingly, we will direct the parties to submit computations showing the correct amount of Mr. Cotler's tax liabilities for 1997 and 1998.

To reflect the foregoing,

<u>An appropriate order will be issued</u>.